# VIRGINIA:

*In the Supreme Court of Virginia held at the Supreme Court building in the City of Richmond on Thursday the 7th day of November, 2019.*

Present: All the Justices

Yashana Spruill,                                                                                    Appellant,

 against                          Record No. 181002
                                 Circuit Court No. CL17-2531-00

Brendon Garcia, et al.,                                                                      Appellees.

                                                             Upon an appeal from a judgment
                                                             rendered by the Circuit Court of the City of
                                                             Norfolk.

This appeal arises from a judgment entered in a personal-injury action by Yashana Spruill against Brendon Garcia and Angela Tyler. The jury awarded a verdict in favor of Spruill against Tyler only on liability but did not award any damages. On appeal, Spruill contends that the trial court erred in admitting certain medical records without proper authentication and in violation of the rule against hearsay evidence. Finding the error asserted to be harmless, we affirm.

I.

On December 5, 2016, Spruill was a passenger in Tyler's vehicle when it was involved in an accident with a vehicle driven by Garcia. As Tyler drove straight through an intersection, Garcia made a left-hand turn in front of Tyler's vehicle, and the two cars collided. Tyler claimed that she had seen a green light as she entered the intersection while Garcia claimed that he had seen a green turn arrow when he started his left turn. Spruill sued both Tyler and Garcia, seeking $50,000 for personal injuries allegedly resulting from the accident.

At trial, the police officer who had responded to the scene testified that he did not remember this particular accident, but he knew that he had asked everyone involved in the accident whether they were injured and that no one had reported any injuries. The officer confirmed that if anyone had reported injuries to him at the scene, he would have had notes about those reported injuries, but his available notes did not contain such details. Based upon his notes from the accident, the officer described the damage to both vehicles as "minimal." 1 J.A. at 210.

Photographs of both vehicles confirmed the officer's description of the damage. Garcia's vehicle had a bent front license plate and some scratches and cracks on the front bumper, *see* R. at 1028-33, and Tyler's vehicle had a few scratches and small dents on the driver's side of the vehicle from the corner of the front bumper to the front wheel, *see id.* at 1034-38. The testimony at trial also confirmed that the accident was minor. Garcia testified that he had slowed down to 10 miles per hour before making the left turn. *See* 1 J.A. at 273, 284. Approximately "[o]ne to two seconds" before impact, he saw Tyler's vehicle coming through the intersection, *id.* at 246, and he "immediately hit [his] brakes and came to a complete stop" before the impact, *id.* at 274. He described the impact as "more of a bump," and he stated that he "wasn't thrown around in [his] car" and had not "experienced whiplash." *Id.* Tyler testified that she had been going approximately 30 miles per hour but had applied her brakes before impact. *See id.* at 292, 296, 307. Tyler also confirmed that the impact "was not that significant" and that she had also not been "thrown around or knocked around inside of the vehicle." *Id.* at 307. Spruill testified that she had been "jarred around a little bit," that her "knee hit the dashboard," and that her "head hit . . . . [t]he back of the seat." 2 *id.* at 432. After the officer had arrived at the scene, both Garcia and Tyler were able to drive their vehicles to a nearby gas station and park. Although Tyler told the officer at the scene that both she and Spruill had "tension," both Tyler and Spruill refused an ambulance. 1 *id.* at 317-19. They also both returned to work immediately following the accident, which had occurred around 2:30 in the afternoon. Later that evening after work, Tyler and Spruill went to an emergency room "not because [they] were feeling tingling or an injury at that time" but "to make sure [they] were okay," *id.* at 319.

Spruill admitted at trial that she had begun to have back problems and numbness in her feet while she was in the military and that she had had an MRI of her back in 1998 just prior to her discharge from the military. Spruill also received physical therapy and epidural steroid injections while she was in the military. Spruill received a ten percent disability rating upon her discharge due to her back problems, and she had annual physicals at the VA Medical Center to confirm her disability rating. Spruill testified that she had had "flare ups" in 2011 and 2013, during which her lower back would hurt with "tingling down the backs of [her] legs," making it "hard to walk." 2 *id.* at 426-27. Spruill admitted to having had an MRI of her back in 2013 but did not recall having had an MRI of her back in 2011. Despite being given medical records from a 2011 visit with Dr. Martin Ton at Consultants in Pain Medicine, Inc. to refresh her recollection

during cross-examination, Spruill again did not recall having had an MRI in 2011 and did not recall having seen Dr. Ton for her back pain, having gone to physical therapy, or having been treated at Consultants in Pain Medicine, Inc. Spruill did confirm, however, that she had gone to a neurologist in 2013 and had reported at the time that she had experienced "chronic lower back pain for more than ten years." *Id.* at 470. Spruill also confirmed that her primary-care physician had prescribed pain medicine and medicine for back spasms due to her chronic lower-back pain and that she took the medicine "as needed." *Id.* at 476.

Dr. Jay Berkowitz, a chiropractor who had treated Spruill after the accident, also testified on Spruill's behalf. Dr. Berkowitz testified that Spruill had first visited him approximately two weeks after the accident and had complained of neck, arm, and left-shoulder pain as well as back pain that had radiated into her left leg. Dr. Berkowitz diagnosed Spruill "with a cervical sprain/strain, cervical radiculitis, . . . . a thoracic sprain/strain, a lumbar sprain/strain," as well as "lumbar radiculitis," 1 *id.* at 347, which he believed were all directly related to the accident based upon Spruill's representation that her pain had not begun until after the accident, *see id.* at 348, 370. On her intake form, Spruill checked that she had a herniated disc. Spruill testified that she had reported a herniated disc because it "was the closest thing" to explaining her previous back problems. 2 *id.* at 440. As the result of a subsequent conversation with Dr. Berkowitz about this reporting of a herniated disc, Spruill brought him some of her medical records, including a report from a 2013 MRI. Dr. Berkowitz testified that he had read that report and confirmed that the report had compared the 2013 MRI to a 2011 MRI. *See* 1 *id.* at 371, 375. The 2013 MRI report revealed that Spruill had disc tears at two levels but "nothing [was] leaking out" of the discs. *Id.* at 375. After looking through Spruill's medical records, Dr. Berkowitz determined that Spruill did not have herniated discs but rather that she had disc protrusions or disc bulges. Dr. Berkowitz testified that he was aware that Spruill had received epidural injections before the accident to treat the disc bulges, *see id.* at 354, and he also confirmed that Spruill had been taking medicine "to help with disc protrusions" just two months prior to the accident, *id.* at 380-81. On re-direct examination, Dr. Berkowitz was questioned about a July 2011 medical record from Spruill's primary-care physician. This record noted that Spruill had "[s]uspected lumbar strain rather than a disc herniation" and contained an instruction that she was to schedule an MRI if her symptoms did not improve. The record, however, did not indicate whether Spruill ever obtained an MRI.

At the conclusion of all of the evidence, Tyler and Garcia sought to introduce copies of the 2011 medical records from Dr. Ton regarding his treatment of Spruill. In lieu of testimony, Tyler and Garcia presented copies of the medical records with a statement of their authenticity signed by the records custodian for Consultants in Pain Medicine, Inc. The statement was not sworn to under oath or made under penalty of perjury but was merely "acknowledged" as being "true and correct" before a notary public. 2 *id.* at 538. The first four pages of the medical records contain an intake or registration form filled out by Spruill with her identifying information, pain symptoms, medical history, and an authorization for release of medical records. *See id.* at 539-42. The fifth page contains Dr. Ton's impressions of Spruill's reported pain symptoms, *see id.* at 543, and the sixth page provides a summary of Spruill's self-reported history of her back pain as well as Dr. Ton's recommendations of proceeding with "medical management, repeat[ing] the interventional therapy," and continuing exercises and therapy at home with a follow-up in a month, *id.* at 544. The seventh page documents the results of an August 13, 2011 MRI that revealed "degenerative dis[c] disease," "dis[c] bulges," and "mild facet arthropathy" at two levels of Spruill's spine. *Id.* at 545. The eighth page contains Dr. Ton's order for an "epidural steroid injection" and lists Spruill's "[c]urrent outpatient prescriptions ordered prior to encounter" (an anti-inflammatory and a pain medicine). *Id.* at 546. The ninth page summarizes the procedure followed for the epidural steroid injection, and the tenth page is a consent form for the injection. *See id.* at 547-48.

Spruill objected to the authentication of the 2011 medical records because the statement by the records custodian was not sworn to under oath or under penalty of perjury pursuant to Code §§ 8.01-391(D) and 8.01-4.3. Spruill also objected to the admission of the records because they had not been identified on the defendants' list of exhibits prior to trial and because they were hearsay and did not fall under the business-records exception since no witness with personal knowledge of the statements in the records had testified. Over these objections, the trial court admitted the records into evidence, finding them admissible pursuant to Code § 8.01-391(D) and Va. R. Evid. 2:1005(d). *See* 2 J.A. at 517. The trial court further found that Garcia and Tyler were using the records solely for impeachment, and thus, they were not required to identify the records on their exhibit lists prior to trial. *See id.* at 516. Prior to closing arguments, however, the trial court ruled that counsel for Garcia could use the records "for any purpose" in his closing argument, not merely for impeachment. *Id.* at 534. Although Spruill had argued that

the records should not be admitted for evidence rather than for impeachment, the trial court did not make any express finding as to the admissibility of the records under the business-records exception to the hearsay rule. The jury reached a verdict in favor of Spruill against Tyler only on liability and awarded $0 in damages. The trial court later denied Spruill's motion to set aside the verdict, and Spruill timely appealed.

## II.

### A.

Spruill contends on appeal that the 2011 medical records were improperly admitted into evidence because they had not been properly authenticated and were inadmissible hearsay. For two reasons, we agree that the medical records should not have been admitted into evidence "for any purpose," *id.*[1]

First, the statement signed by the custodian of the 2011 medical records was not an affidavit made under oath or an unsworn declaration made under penalty of perjury but instead was merely "acknowledged" as "true and correct" before a notary public, *id.* at 538. *See* Code

---

[1] The extended argument before the trial court concerning the 2011 medical records at times indicated that these records were being considered for impeachment purposes only. But given our disposition of this case, *see infra* Part II.B., we need not discuss in detail whether the court's ruling and the use of these records at trial were effectively limited to the realm of impeachment. We note in passing that evidence that would typically be inadmissible under the hearsay rule may be admissible for the limited purpose of impeaching a witness's credibility. *See Manetta v. Commonwealth*, 231 Va. 123, 127 (1986) (acknowledging that "the hearsay rule is no barrier" to the admission of evidence that "is offered for a different purpose" other than "the truth of the matter asserted" (emphasis and citation omitted)); 1 Craig D. Johnston, Virginia Practice Series: Trial Handbook for Virginia Lawyers § 28:2, at 514-15 (2019 ed.) (acknowledging that "[i]n some circumstances evidence which might be barred under the Rule against hearsay may be admitted for some limited purpose"); Kent Sinclair & Charles E. Friend, The Law of Evidence in Virginia § 15-4, at 982-83 (8th ed. 2018) [hereinafter Sinclair & Friend, The Law of Evidence] (stating that such evidence is sometimes considered "'not hearsay' at all" and noting that Va. R. Evid. 2:801(c) confirms this view by limiting the definition of hearsay to out-of-court statements "offered in evidence to prove the truth of the matter asserted" (citation omitted)). The trial court may give a limiting or cautionary instruction to the jury that limits the scope of such evidence solely to impeachment, *see* Va. R. Evid. 2:105 (requiring a trial court to grant such an instruction upon the motion of a party but also permitting the court to grant such an instruction sua sponte), but the opposing party may also waive such an instruction, *see Hall v. Commonwealth*, 233 Va. 369, 375 (1987). Waiver of a limiting or cautionary instruction, however, does not "convert[] the hearsay content of the impeaching statements into substantive proof of their truth." *Commercial Distribs., Inc. v. Blankenship*, 240 Va. 382, 394 (1990). *See generally* Sinclair & Friend, The Law of Evidence, *supra*, § 12-3[a], at 682-83.

§ 8.01-391(D) (requiring copies of business records, in order to be "admissible in evidence as the original," to be identified and authenticated as true copies "through witness testimony or a certificate by affidavit or by declaration pursuant to § 8.01-4.3, or a combination of witness testimony and a certificate"); Code § 8.01-4.3 (requiring an unsworn declaration to be "subscribed by the maker as true under penalty of perjury, and dated, in substantially the following form: 'I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct'"); *see also* 2 Charles E. Friend & Kent Sinclair, Friend's Virginia Pleading and Practice § 40.03[2][b], at 40-31 n.133 (3d ed. 2017) [hereinafter Friend & Sinclair, Pleading and Practice]; *id.* § 40.04[4], at 40-35. The statement thus failed to satisfy the statutory authentication requirements.[2]

Second, even if the 2011 medical records had been properly authenticated, Tyler and Garcia provided no foundation for the records to satisfy the business-records exception to the hearsay rule.[3] *See generally* Friend & Sinclair, Pleading and Practice, *supra*, § 40.03[2][b], at 40-32 (noting that Code § 8.01-391(D) "does not create a hearsay exception" but "merely makes copies admissible if the original would be admissible" (emphases omitted)). Va. R. Evid. 2:803(6) permits the introduction of business records if

---

[2] Our resolution of this case does not require us to address the best evidence rule or to distinguish between original documents and copies of such documents. *See generally* Code § 8.01-413(A) (authorizing the admission of copies of original medical records that "would be admissible as evidence" if the copies have been "properly authenticated"); Va. R. Evid. 2:1005(d) (authorizing the admission of copies of otherwise admissible original business records if "satisfactorily identified and authenticated"); Sinclair & Friend, The Law of Evidence, *supra* note 1, § 16-3, at 1194 (observing that the Source Note for Va. R. Evid. 2:902(3) specifically cross-references Code § 8.01-413 as a statute that "provide[s] for presumptive or prima facie genuineness or authenticity"); *id.* § 17-4[d], at 1246 n.85 (noting that the admissibility of copies of medical records under Code § 8.01-413 "is actually a 'best evidence' problem, rather than a question of authentication"); *id.* § 18-7, at 1282 (noting that Code § 8.01-413 "solely" addresses a "best evidence exception[]" because it "make[s] copies of the specified document admissible *only when the original document is made admissible by some other statute or rule*" (emphasis in original)).

[3] On appeal, Tyler's counsel conceded at oral argument that he had not laid the foundation for the business-records exception to the hearsay rule. *See* Oral Argument Audio at 16:19 to 17:45 (admitting that the "prongs" for the business records exception to the hearsay rule were not "met" and agreeing that there was "no hearsay foundation laid" under the "modern shopbook rule").

(A) the record was made at or near the time of the acts, events, calculations, or conditions by — or from information transmitted by — someone with knowledge;

(B) the record was made and kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making and keeping the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 2:902(6) or with a statute permitting certification; and

(E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

The proponent of a business record can satisfy these requirements by live testimony, a sworn affidavit or an unsworn declaration under penalty of perjury, or a combination of both. *See* Code § 8.01-390.3(A); Va. R. Evid. 2:902(6)(a). *See generally* Sinclair & Friend, The Law of Evidence, *supra* note 1, § 15-22[e], at 1100-03. The statement signed by the custodian of the 2011 medical records, however, made no attempt to satisfy the requirements of Rule 2:803(6). Furthermore, Code § 8.01-390.3(B) requires the proponent of a business record to provide "notice and [a] copy of the record and certification . . . no later than 15 days in advance of the trial or hearing" in order to give the opposing party time to object to the certification and thereby require witness testimony to establish authentication and foundation for the business record. *See also* Va. R. Evid. 2:902(6)(b) (same). Tyler and Garcia failed to provide Spruill such notice as well as a copy of the 2011 medical records and the statement by the records custodian.

In short, neither the requirements of the authentication statute nor Rule 2:803(6) were satisfied. *See* Sinclair & Friend, The Law of Evidence, *supra* note 1, § 15-22[e], at 1102-03 (noting that "[t]he authentication of the record *and* the foundation required by subdivision (6) of Rule 2:803 of the Rules of [the] Supreme Court of Virginia are not changed by" Code § 8.01-390.3, which permits both of these requirements to be satisfied by either sworn affidavit or by unsworn declaration under penalty of perjury (emphasis added)); *id.* § 17-4[c][3], at 1245 ("No statute, by itself, makes a document admissible unless the statute addresses or waives all three evidentiary problems — the best evidence rule, the authentication requirement, and the hearsay rule." (emphasis omitted)).

B.

Despite the merits of Spruill's arguments regarding authentication and the business-records exception to the hearsay rule, we search in this case and in all cases for "the best and narrowest grounds available" for decision, *Commonwealth v. White*, 293 Va. 411, 419 (2017) (citation omitted). Here, that ground is harmless error.

Any error that does not implicate the trial court's subject matter jurisdiction is subject to harmless-error analysis because "Code § 8.01-678 makes 'harmless-error review required in *all* cases.'" *White*, 293 Va. at 420 (emphasis in original) (citation omitted). Absent an error of constitutional magnitude, "no judgment shall be arrested or reversed" "[w]hen it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached," Code § 8.01-678. Applying this standard, a non-constitutional error is harmless "if, when all is said and done, the error did not influence the jury, or had but slight effect." *Commonwealth v. Swann*, 290 Va. 194, 201 (2015) (per curiam) (alterations and citation omitted). "The harmless-error concept is no mere prudential, judge-made doctrine of appellate review," but rather, it "is a legislative mandate, which has been part of our statutory law since the early 1900s, and limits the adjudicatory power of Virginia appellate courts." *White*, 293 Va. at 419. "The harmless-error check on judicial power has never been a begrudged limitation, but rather one 'favored' by Virginia courts," *id.* at 420 (citation omitted), because it stems from the "imperative demands of common sense," *Oliver v. Commonwealth*, 151 Va. 533, 541 (1928). Thus, "it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless" lest such courts "retreat from their responsibility, becoming instead 'impregnable citadels of technicality.'" *United States v. Hasting*, 461 U.S. 499, 509 (1983) (alteration and citation omitted).

Each of the pages in the 2011 medical records contains information either that came into evidence through the testimony of Spruill and Dr. Berkowitz or that had only a slight effect upon the verdict. The first four pages of the medical records contain an intake or registration form that Spruill filled out and signed when she first visited Dr. Ton. These pages merely contain her identifying information, pain symptoms, medical history, and an authorization for release of medical records. *See* 2 J.A. at 539-42. While Spruill did not recall having ever visited Dr. Ton, she did admit that she had seen her primary-care physician for a "flare up[]" in 2011, during which she had experienced similar symptoms to the ones reported on the intake form, *id.* at 426-

8

27 (describing "[a] flare up" as a time when her "lower back hurt" with "some tingling down the backs of [her] legs," making it "hard to walk"). The fifth page of the medical records contains Dr. Ton's impressions of Spruill's pain symptoms, which merely describe those pain symptoms in medical terms, such as "[b]ack and bilateral leg pain" and "[b]ilateral lumbar radiculopathy," *id.* at 543. These impressions are repeated on the sixth page of the medical records in the history of Spruill's condition, *see id.* at 544, which was partially read to Dr. Berkowitz during his testimony with no objection by Spruill, *see* 1 *id.* at 382-83. The sixth page further contains a summary of Dr. Ton's recommended treatment that he conveyed to Spruill. *See* 2 *id.* at 543.

The seventh page of the medical records notes the 2011 MRI and its results, *see id.* at 545, which Spruill did not recall. Dr. Berkowitz, however, testified that the report of the 2013 MRI specifically had compared the results of the 2013 MRI to a 2011 MRI and that the results of the 2013 MRI were largely the same — disc tears at two levels, *see* 1 *id.* at 375, which he deemed to be disc bulges or protrusions rather than herniated discs, *see id.* at 337. The results of the 2013 MRI and the fact that it was compared to a 2011 MRI came in through Dr. Berkowitz's testimony without objection. *See id.* at 371, 375.

The eighth page of the medical records lists Spruill's current medications, *see* 2 *id.* at 546, but Spruill confirmed during her testimony that her primary-care physician had prescribed "pain medicine and medicine for spasm" for her to take "as needed" due to her "lower back problems for over ten years," *id.* at 476. The eighth, ninth, and tenth pages of the medical records document an epidural steroid injection that Spruill had received from Dr. Ton during her visit, *see id.* at 546-48, but Dr. Berkowitz testified that he was aware that Spruill had previously received epidural steroid injections for her disc bulges, *see* 1 *id.* at 354.

Having reviewed the record as a whole, we believe that the 2011 medical records contain information that was directly or indirectly provided by, testified to, confirmed by, or alluded to by either Spruill or Dr. Berkowitz at trial. To the extent that specific details in those records were not directly or indirectly before the jury from other sources, the relevance of such details is diminished by the persuasive force of the entire record in this case. With or without the 2011 medical records, the jury heard Spruill's admission to having chronic back pain with intermittent symptoms going back to at least 1998 when she first had received an MRI while she was in the military and her admission that she had experienced two separate flare ups of her back pain in 2011 and 2013. All of this evidence has enhanced weight because the uncontested physical and

9

testimonial evidence demonstrates a very minor collision. In the unique context of this case, we hold that the admission of the 2011 medical records was harmless error because such evidence was either cumulative "or had but slight effect," *Swann*, 290 Va. at 201 (citation omitted), if any, upon the jury's verdict.

III.

In sum, despite any evidentiary errors made by the trial court, "it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached," Code § 8.01-678. We thus affirm the judgment of the trial court. This order shall be published in the Virginia Reports and certified to the Circuit Court of the City of Norfolk.

A Copy,

Teste:

Douglas B. Robelen, Clerk

By:

Deputy Clerk